

**U.S. Department of Justice**

*Criminal Division*　　　　　　　*United States Attorney*
*Fraud Section*　　　　　　　　　*District of Maryland*
　　　　　　　　　　　　　　　　*Southern Division*

*KDH*

| | | | |
|---|---|---|---|
| *Matt Kahn, Trial Attorney* | *Mailing Address:* | *Office Location:* | *DIRECT: 202-305-1648* |
| *Brandon Burkart, Trial Attorney* | *1400 New York Ave., N.W.* | *1400 New York Ave., N.W.* | *MAIN: 202-514-2000* |
| *Criminal Division, Fraud Section* | *Washington, D.C. 20005* | *Washington, D.C. 20005* | *FAX: 202-514-3708* |
| *Matthew.Kahn2@usdoj.gov* | | | |
| *Brandon.Burkart@usdoj.gov* | | | |
| | | | |
| *Patrick D. Kibbe* | *Mailing Address:* | *Office Location:* | *DIRECT: 301-344-0872* |
| *Assistant United States Attorney* | *6500 Cherrywood Lane, Suite 200* | *6406 Ivy Lane, 8ᵗʰ Floor* | *MAIN: 301-344-4433* |
| *Patrick.Kibbe@usdoj.gov* | *Greenbelt, MD 20770-1249* | *Greenbelt, MD 20770-1249* | *FAX: 301-344-4516* |

May 31, 2024

David Benowitz, Esq.
Rammy Barbari, Esq.
Price Benowitz LLP
409 7th Street, N.W. #100
Washington, D.C. 20004

　　　　　Re:　　Underline: United States v. Paul Anthony Young
　　　　　　　　Criminal No. [TBD]

Dear Counsel:

　　　　This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Paul Anthony Young (the "Defendant"), by the United States Department of Justice, Criminal Division, Fraud Section and the United States Attorney's Office for the District of Maryland (collectively, the "Government"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **5:00 p.m. on June 4, 2024**, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offense of Conviction</u>

　　　　1.　　The Defendant agrees to waive his right to be indicted by a Grand Jury and agrees to plead guilty to Count One of an Information to be filed against the Defendant, which will charge him with Conspiracy to Commit Bribery of a Public Official, in violation of 18 U.S.C. § 371. The Defendant admits that the Defendant is, in fact, guilty of this offense and will so advise the Court.

<u>Elements of the Offense</u>

2.      The elements of the offense to which the Defendant has agreed to plead guilty, and which the Government would prove beyond a reasonable doubt if the case went to trial, are as follows:  That, on or about the date alleged in the Information, in the District of Maryland and elsewhere, (1) the Defendant and at least one other person entered into the unlawful agreement charged in the Information, (2) the Defendant knowingly and willfully became a member of the conspiracy, (3) one of the members of the conspiracy committed at least one of the overt acts charged in the Information, and (4) the overt act was committed in furtherance of some objective of the conspiracy.

<u>Penalties</u>

3.      The maximum penalties provided by the statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 371 | N/A | 5 years | 3 years | $250,000, or the greater of twice the gross gain or twice the gross loss | $100 |

a.      Prison:  If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.      Supervised Release:  If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

c.      Restitution:  The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.      Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d).  The Defendant may be required to pay interest if the fine is not paid when due.

e.      Forfeiture:  The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.      Collection of Debts:  If the Court imposes a fine or restitution, the Government will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes the Government to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by the Government.

<u>Waiver of Rights</u>

4.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to have a grand jury consider the charges in the Information against him.  The Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel.  That trial could be conducted by a judge, without a jury, if the Defendant, the Government, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community.  Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily.  All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count.  The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt.  The Defendant would have the right to confront and cross-examine the Government's witnesses.  The Defendant would not have to present any defense witnesses or evidence whatsoever.  If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.      The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify.  If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.    If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.    By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.    If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h.    By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.    The Defendant understands that the Court will determine a sentencing guidelines range for this case (the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

6.      The Government and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

Count One (Conspiracy to Commit Bribery of a Public Official)

a.      The Government and the Defendant agree that the base offense level is **12**, pursuant to U.S.S.G. §§ 2C1.1(a)(2) and 2X1.1(a), because the Defendant is not a public official.

b.      The Government and the Defendant agree that a **2**-level increase applies, pursuant to U.S.S.G. § 2C1.1(b)(1), because the offense involved more than one bribe.

c.      The Government and the Defendant agree that at least an **18**-level increase applies, pursuant to U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(J), because the value of the benefit received was between at least $3.5 million and $9.5 million.  The Government reserves the right to argue at sentencing that the value of the benefit received was greater than $9.5 million, which would result in a higher total offense level.

d.      The Government and the Defendant agree that at a **4**-level increase applies, pursuant to U.S.S.G. § 2C1.1(b)(3), because the offense involved a public official in a high-level decision-making or sensitive position.

e.      The Government does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct.  The Government agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty.  The Government may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, the Government, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

f.      The Defendant reserves the right to argue at sentencing that a 2-level downward adjustment applies because of the criteria set forth in U.S.S.G. § 4C1.1 (Adjustment for Certain Zero-Point Offenders) have been met.  The Government reserves the right to argue at sentencing that this downward adjustment does not apply.

7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8. No other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range, except those specifically reserved in this Agreement.

## Obligations of the Parties

9. At the time of sentencing, the Government and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). The Government and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that the Government or the Defendant deem relevant to sentencing, including the conduct that is the subject of Count One of the Information.

## Forfeiture

10. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense.

11. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: a money judgment in the amount of proceeds the Defendant obtained as the result of his participation in the conspiracy to commit bribery.

12. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

13. The Defendant agrees to assist fully in the forfeiture of the property described above, including fully cooperating in the execution of the money judgment entered by the Court. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the

jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

14.    The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Restitution

15.    The Defendant agrees to the entry of a restitution order for the full amount of the victims' losses. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The total amount of restitution shall be due immediately and shall be ordered to be paid forthwith. Any payment schedule imposed by the Court establishes only a minimum obligation. Defendant will make a good faith effort to pay any restitution. Regardless of Defendant's compliance, any payment schedule does not limit the United States' ability to collect additional amounts from Defendant through all available collection remedies at any time. The Defendant further agrees that the Defendant will fully disclose to the Government, the probation officer, and to the Court, subject to the penalty of perjury, all information (including but not limited to copies of all relevant bank and financial records) regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this Agreement, and the Government may seek to be relieved of its obligations under this Agreement.

Waiver of Appeal

16.    In exchange for the concessions made by the Government and the Defendant in this Agreement, the Government and the Defendant waive their rights to appeal as follows:

a.    The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent that such challenges legally can be waived.

b.    The Defendant and the Government knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional

7

challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

        i.      The Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds the top of the final advisory guidelines range as calculated by the Court at sentencing; and

        ii.      The Government reserves the right to appeal any term of imprisonment to the extent that it is less than the bottom of the final advisory guidelines range as calculated by the Court at sentencing.

        c.      The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from the Government or any investigating agency.

<u>Defendant's Conduct Prior to Sentencing and Breach</u>

17.     Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, the Government, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) the Government will be free from its obligations under this Agreement; (ii) the Government may make sentencing arguments and recommendations different from those set out in this Agreement; and (iii) in any criminal or civil proceeding, the Government will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that the Government is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea if the Court finds that the Defendant breached the Agreement.

<u>Court Not a Party</u>

19.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations

under this Agreement. Neither the prosecutors, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

Entire Agreement

20.    This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Glenn S. Leon
Chief
United States Department of Justice
Criminal Division, Fraud Section

_____
Matt Kahn
Brandon Burkart
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section


Erek L. Barron
United States Attorney
United States Attorney's Office
District of Maryland


_____
Patrick D. Kibbe
Assistant United States Attorney

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorneys. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorneys, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorneys.

05/31/2024_____                _____
Date                                  Paul Anthony Young

We are the Defendant's attorneys. We have carefully reviewed every part of this Agreement, including the Sealed Supplement, with the Defendant. The Defendant has advised us that the Defendant understands and accepts the terms of this Agreement. To our knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

_____                _____
Date                                  David Benowitz, Esq.
                                          Rammy Barbari, Esq.
                                          PRICE BENOWITZ LLP
                                          *Counsel for the Defendant*

## ATTACHMENT A

## STATEMENT OF FACTS

*The undersigned parties stipulate and agree that if this case had proceeded to trial, the Government would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

## RELEVANT INDIVIDUALS AND ENTITIES

At all times relevant to the offense:

PAUL ANTHONY YOUNG ("YOUNG"), a Maryland resident, was the president of ████ ████████ ("████████"), which contracted with U.S. government agencies to provide Information Technology services, and which maintained its headquarters in Fulton, Maryland.

Coconspirator ("CC") 1, a Maryland resident, was a contracting officer at the United States Agency for International Development ("USAID"), and as such, a public official. USAID was a government agency headquartered in Washington, D.C., which led the United States Government's international development and disaster assistance to save lives, reduce poverty, strengthen democratic governance, and help people emerge from humanitarian crises. CC-1 was friends with YOUNG.

CC-2, a Florida resident, was the president of Company 2. Company 2 contracted with government agencies, including USAID, to provide administrative and technology services. Company 2 maintained its headquarters in Washington, D.C. YOUNG was friends with CC-2 whom he introduced to CC-1. At times, CC-2's company, Company 2, hired ████████, YOUNG's company, as a subcontractor on government contracts. Since 2004, the U.S. government has obligated approximately $271 million in funds in connection with Company 2's prime contracts with the U.S. government.

CC-3, a Maryland resident, was the founder, owner, and president of Company 3. Company 3 contracted with government agencies, including USAID, to provide consulting and other services and maintained its headquarters in Towson, Maryland. At times, Company 3 also provided contract support to USAID in connection with its mission to provide humanitarian aid, such as a $100 million purchase agreement for humanitarian aid and support across Ukraine. YOUNG was friends with CC-3. At times, CC-3's company, Company 3, hired ████████, YOUNG's company, and Company 2, CC-2's company, as subcontractors on USAID contracts. Since 2015, the U.S. government has obligated approximately $198 million in funds in connection with Company 3's prime contracts with the U.S. government.

████████████████████████████████. CC-4 worked at Company 2 and then was hired by USAID where CC-4 eventually became a contracting officer.

## THE CONSPIRACY TO BRIBE A PUBLIC OFFICIAL

Between in and around 2013 and in and around 2023, YOUNG and his coconspirators bribed CC-1, a public official, repeatedly—in fact, through hundreds of monthly payments and other things of value, including laptops, cellular phones, funds needed to obtain mortgages, jobs for relatives, and other gifts and favors—with intent to influence at least one official act, namely, the award of USAID contracts valued at hundreds of millions of dollars to CC-2's company, Company 2, and CC-3's company, Company 3. Moreover, YOUNG joined the conspiracy in order to obtain subcontracts through Company 2 and Company 3 for government prime contracts with USAID and other government agencies. The conspiracy involved at least 14 contracts valued at approximately $524.7 million, including:

- between in and around 2013 and in and around 2015, the award of four contracts to Company 2 valued at approximately $45.8 million;

- between in and around 2018 and in and around 2022, the award of seven contracts to Company 3 valued at approximately $211 million; and

- between in and around 2022 and in and around 2023, the potential award of three contracts to Company 3 valued at approximately $286.8 million, two of which have not been awarded, and a third that was not awarded to Company 3.

| | Approximate Contract Timeframe | General Contract Description | Prime Contractor Company | ████ / Company 2 Subcontracts | Approximate Contract Value |
|---|---|---|---|---|---|
| 1) | 4/30/13 - 10/31/18 | Staffing Contract (OAAC1300079) | Company 2 | None | $4.8 million |
| 2) | 9/15/14 - 9/29/20 | Institutional Support (OAAE1400003) | Company 2 | None | $37.1 million |
| 3) | 3/26/15 - 12/7/15 | Knowledge Management (OAAO1500009) | Company 2 | None | $22,000 |
| 4) | 9/21/15 - 9/20/18 | Communications Support (OAAC1500070) | Company 2 | None | $3.9 million |
| 5) | 8/14/18 - 10/14/23 | Professional Management (7200AA18C00078) | Company 3 | ████ | $30 million |
| 6) | 9/10/18 - 11/30/23 | Professional Management (7200AA18C00085) | Company 3 | ████ / Company 2 | $25.5 million |
| 7) | 9/28/18 - 3/31/22 | Administrative Support (7200AA18C00092) | Company 3 | ████ | $3.5 million |
| 8) | 8/16/19 - 9/9/25 | Cybersecurity (7200AA19C00061) | Company 3 | None | $19.5 million |
| 9) | 6/1/20 - 11/30/22 | Technical Support (7200AA20C00042) | Company 3 | Company 2 | $28.5 million |
| 10) | 3/23/22 - 3/20/27 | Administrative Support (7200AA22C00019) | Company 3 | ████ | $9 million |

| 11) | 5/9/22 - 5/22/27 | Technical Support (7200AA22C00032) | Company 3 | None | $95 million |
|---|---|---|---|---|---|
| 12) | Not Applicable | Innovative Design (7200AA23R00032) | Company 3 | None | $94 million |
| 13) | Not Applicable | Planning and Learning (7200AA22R00042) | Company 3 | None | $143 million |
| 14) | Not Applicable | Professional Management (7200AA23Q00021) | Company 3 | None | $49.8 million |
| **Approximate Total Value of Contracts** | | | | | **$543.6 million** |

## COMPANY 2 (CONTRACTS 1 THROUGH 4)

In and around 2013, Company 2 attempted to obtain its first USAID contract. Before the contract was awarded, CC-1 asked YOUNG if Company 2 could perform on the contract. Once the contract was awarded, CC-1 asked YOUNG if CC-2 would give CC-1 money in exchange for keeping Company 2 on the contract. CC-2 agreed to give CC-1 money through YOUNG, who also agreed to transfer the money.

On or about June 6, 2014, CC-1 texted YOUNG, "I had a long talk with [CC-2.] We need to talk about the potential money losses you are incurring and the fact you're not filthy rich[.]" YOUNG replied, "I could/would be making a lot of money." CC-1 replied, "[T]he fact I have to ask you for money for BS stuff bothers the hell out of me ... Like I'm not smart enough to make millions for sourcing contracts[.]" YOUNG replied, "Believe me time will come." CC-1 replied that with "mounting debt I almost asked [CC-2] for a loan .... Or advance[.]"

On or around August 8, 2014, a few weeks before Company 2 was awarded its second USAID contract, CC-2 discussed with YOUNG ways to conceal the bribe payments. CC-2 texted YOUNG, "[I]f possible, give it to some other third party to give him. That way you can honestly say you never gave him anything … never give anything but cash to you know who."

In addition to payments, CC-1 also sought other things of value from CC-2 through YOUNG. For example, on or about September 11, 2014, a few weeks after Company 2 was awarded its second USAID contact, CC-1 asked for an iPhone 6. CC-1 texted YOUNG, "[T]his is a great olive branch that can be dropped from your boy … I like shiney [sic] objects!!!" CC-3 thereafter purchased a phone and gave it to YOUNG, who then gave it to CC-1.

In and around August 2015, Company 2 was awarded its fourth USAID contract, after which Company 2 graduated from the U.S. Small Business Administration's ("SBA's") 8(a) Business Development Program, which helps socially and economically disadvantaged businesses receive sole-source (i.e., non-competitive) contracts. CC-2 and Company 2 later worked as a subcontractor for CC-3 and Company 3 on USAID contracts as a result of bribe payments that YOUNG funneled to CC-1. CC-2 also continued to discuss bribe payments with YOUNG.

3

For example, in and around October 2015, YOUNG purchased a laptop for CC-1 on behalf of CC-2. CC-2 stated in a text message to YOUNG, "You know you can bill me an 'administrative fee'. How much was it?" After YOUNG replied that it was $2,000, CC-2 stated, "Let's talk today about your next invoice to me."

Likewise, on or about November 10, 2015, CC-2 texted YOUNG, "[CC-1] wanted to get together. I'm only here til[l] noon[.]" YOUNG responded, "Should be in office a little bit after 9." Later in the day, YOUNG texted CC-2, "So since August I have sent 2565. Now add the 3700." The "2565" and "3700" was money that YOUNG transferred to an account that CC-1 created in the name of a fictitious entity to conceal the nature of payments under the guise of consulting:

| Approximate Date | Approximate Payments |
|:---:|:---:|
| 8/17/15 | $670 |
| 9/7/15 | $245 |
| 9/17/15 | $800 |
| 10/13/15 | $400 |
| 11/4/15 | $450 |
| (Approximate Total) | ($2,565) |
| 11/10/15 | $3,700 |

On or about December 21, 2015, CC-2 texted YOUNG, "Wondering whether you've chatted with [CC-1] recently[.]" YOUNG replied, "I have. [T]rying to figure out a better reimbursement. I am in the hole." CC-2 replied, "I am just getting to Bmw dealer on route 40. I'll call you in 10[.]" This conversation related to bribe payments to CC-1. Two days later (on or about December 23rd), YOUNG sent a follow up text message to CC-2. YOUNG stated, "If you can, please bring my check with you." CC-2 replied, "I have it."

On or about May 24, 2016, CC-2 texted YOUNG, "Forgot to have [Company 2's Accountant] get apple laptop. I just ordered it at [a computer store]. Want to pick it up tomorrow for your friend [CC-1]?" YOUNG replied, "Sure I will get it in the morning[.]" CC-2 replied, "I'll send you the email when it's ready. I've ordered it already[]." YOUNG replied, "Can you add me as the pickup person?" CC-2 replied, "Already did[.]" YOUNG replied, "Got it[.]" Later that day, CC-2 texted YOUNG, "Did you give the laptop to [CC-1]?" YOUNG replied, "I picked it up. Haven't given to [CC-1] yet. [CC-1] will come by tomorrow and get it[.]" YOUNG replied, "Ok[.]"

4

## COMPANY 3 (CONTRACTS 5 THROUGH 14)

### A. CONTRACT 5

#### i. YOUNG Began Making Payments from CC-3 to CC-1.

On or about September 26, 2016, YOUNG texted CC-3, "I was told by [CC-1] to play this game because millions are involved so I am." Three days later (on or about September 29th), YOUNG sent a text to CC-3 stating that CC-2 "[did not] want to do anymore pay to play." Nevertheless, CC-2 continued to funnel bribe payments to CC-1 via YOUNG. As a result, CC-2 and Company 2, as well as YOUNG and ████████, subsequently received subcontracts from Company 3 to work on its USAID contracts. In addition, YOUNG began making payments from CC-3 to CC-1.

On or about March 29, 2017, CC-1 sent an email with the subject "POSSIBLE TEAMING FOR USAID ACTIVITIES" in which CC-1 introduced YOUNG and ████████ to vendors: "As programming of funds is a very hot topic, the sooner you all can meet and discuss potential partnerships the better. Due to 'optics' and procurement integrity, I can only make the initial introductory of parties and leave to all to initiate further discussions going forward." Although CC-1 exhibited a strict sensitivity about CC-1's role as a public official when interacting with vendors, in contrast, CC-1 used his position and influence as a public official in favor of the coconspirators. For example, CC-1 shared confidential information to benefit them in the procurement process.

On or about April 27, 2017, CC-3 texted YOUNG, "And THATs why I would prefer that [CC-1] start us with something small. A sole source contract with 10 or less FTEs [full time employees]. That big staffing contracts are very difficult for us to do without his quals. And Company 2 won't care bc [sic] it's small and it's a sole source. That's what I've been saying as far as talking to [CC-1] about a strategy to get is in." CC-3 also texted, "[O]ur value add assuming [CC-1] can expedite will be the clearance in addition to our relationship with [CC-1]."

On or about May 24, 2017, YOUNG separately exchanged text messages with CC-3 and CC-1, shifting back and forth between them to facilitate their respective discussions:

CC-3 texted YOUNG, "Any word from [CC-1] on the Tuesday mtg." YOUNG replied, "When I talked to him yesterday he hadn't talk [sic] with the person yet because of some sort of training. [CC-1] is bugging me about the money so I will ask again tonight." CC-3 replied, "about paying him or what we will allocate?" YOUNG replied, "His current payment." CC-3 replied, "So you're going to the bank right?" YOUNG replied, "when the money hits my account."

Around the same time that YOUNG texted with CC-3, YOUNG separately texted CC-1, "It's supposed to hit my account tomorrow. Where is my invoice?"

The next day, YOUNG transferred approximately $4,000 from his ████████ account to CC-1.

### ii.    YOUNG Transferred Approximately $17,000 From CC-2 to CC-1, Which CC-1 ▮▮▮▮ Used to Obtain a Mortgage.

Between in or around June 2017 and in or around July 2017, YOUNG made a payment from CC-2 to CC-1, which CC-1 ▮▮▮▮ used to obtain a mortgage.

On or about July 5, 2017, YOUNG texted CC-1, "Hey [CC-2] just thought of this. Can [CC-2] give the money through a bonus to [CC-4]?" Later that day, YOUNG texted CC-2, "Waiting on [CC-1] to get back to me on [CC-4.]" CC-2 replied, "We can wire tomorrow[.]" Later that day, YOUNG replied to CC-2, "[CC-1] is not comfortable with that option. Want as few eyes as possible. Especially women. his words. Will invoice tonight[.] On FaceTime with [CC-1] now[.]" CC-2 replied, "Cool I'm good with that[.]"

On or about July 6, 2017, CC-1 texted YOUNG, "[Financial Institution] Account XXXXX6207 Routing XXXXX6110[.]" That same day, CC-1 sent another government agency a past performance document on behalf of CC-2 and Company 2, which CC-1 had received from YOUNG.

On or about July 7, 2017, CC-2 texted YOUNG, "I'm going to write a new subcontract for the payment. I'll be having you give me a flat price quote … Then I'm covered for our audit." YOUNG replied, "Ok[.]" Later that day, CC-2 texted, "[Company 2's Accountant] did wire today." YOUNG replied, "Ok[.]" That same day, Company 2 transferred approximately $19,500 to YOUNG, and YOUNG transferred approximately $17,000 to CC-1.

On or about August 4, 2017, the closing transaction for the mortgage occurred.

### iii.    YOUNG Continued Making Payments to CC-1 from CC-3 in the Months Leading to the First Contract Award to Company 3.

On or about March 1, 2018, YOUNG texted CC-3, "Send [CC-1] your cap [capability] statement. There may be a sole source [contract] in our future. Big money[.]" CC-3 replied, "Ok will do[.]" YOUNG replied, "[CC-1] needs it for tomorrow morning." CC-3 replied, "Sent." In the email that CC-3 sent to CC-1, CC-3 stated, "Mr. [CC-1], Please see the attached capability statement. Feel free to contact me with any questions."

On or about March 27, 2018, CC-1 texted YOUNG, "Will need to have a discussion with you [YOUNG] and [CC-3] about an RFP [Request for Proposal] that I'll need to put out. Have to decide on an approach[.]" To facilitate the discussion, YOUNG texted CC-3, "What's your Thursday or Friday afternoon look like? [CC-1] wants to discuss a Rfp he [sic] putting out." The next day (on or about March 28th), YOUNG exchanged separate text messages with CC-1 and CC-3, again shifting back and forth between CC-1 and CC-3:

- CC-1 texted YOUNG, "If [CC-3] is a PMO then I need to know if what I sent [CC-3] can be a fit[.]" YOUNG replied, "Got it[.]"

- Shortly thereafter, CC-3 texted YOUNG, "Ok I've read through most of it. I'll give you a call when I get out of this meeting." YOUNG replied, "I got a 2 to 3. Let's talk after that." CC-3 thereafter called YOUNG.

- Shortly thereafter, YOUNG texted CC-1, "It's a fit. We need to talk about. Do you want to meet Friday or do a phone call?" CC-1 replied, "Sounds like a plan. Let's plan to talk on Friday midday[.]" YOUNG replied, "Phone or in person?" CC-1 replied, "I can accommodate[.]"

- That day, CC-1 emailed both CC-3 and YOUNG: "[L]et me know if your firm has 'near' capability to either lead/manage or JV [joint venture]." CC-1 attached:

  o A "Market Research Memo," which listed 18 small businesses capable of completing the contract (which did not list Company 2 or Company 3); and

  o an "SOW" or statement of work for the contract with the following capitalized label, "[PROCUREMENT SENSITIVE_ DO NOT SHARE]".

On or about March 29, 2018, on or about the day after CC-1 shared the procurement sensitive information, YOUNG texted CC-3 about purchasing a suite to watch a basketball game in Washington, D.C., "$3000 for the suite next Friday. You good?" CC-3 replied, "Call me[.]" YOUNG later texted CC-1, "Don't be asking questions. Getting a suite for the [W]izards game." CC-1 replied, "Phase One has been approved to start[.]"

CC-3 continued to bribe CC-1 via YOUNG , which at times caused friction with CC-2 who continued to bribe CC-1, and which YOUNG would attempt to mediate in furtherance of the conspiracy:

- For example, on or about April 6, 2018, CC-3 texted YOUNG, "Need to make sure [CC-1] stays focused and doesn't give in to [CC-2's] bribes[.]" YOUNG replied, "Believe me that will not happen[.]"

- Four days later (on or about April 10th), YOUNG texted CC-3, "Man your boy [CC-2] is pissing [CC-1] off. [CC-1] said [CC-2] thinks [CC-2] has [CC-1] in [CC-2's] back pocket."

On or about April 24, 2018, CC-3 texted YOUNG, "Are you available tomorrow around 5? Need to have a sit down w[ith] [CC-1] again[.]" YOUNG replied, "Yes for 5." CC-3 replied, "Want to iron out agreement[.] I'll put some ideas together and send them your way[.]" Five days later (on or about April 29th), CC-3 texted YOUNG, "Good meet up w [CC-1.]" YOUNG replied that CC-3 "cleared things up. Moving forward everyone is going to be happy[.]"

On or about May 3, 2018, CC-1 emailed an official Request for Information ("RFI") on the contract to CC-3 and YOUNG: "Please find attached a RFI that requires response prior to providing your firm consideration of a Sole Source Award via a formal [Request for Proposal]. Once we've received [a] response we will provide additional information regarding establishment

7

of Joint Ventures or Corporate Teaming Agreements[.]" The next day, YOUNG texted CC-3, ███ is not part of the rfi response?" CC-3 replied, "should be but I'll ask [CC-1.] I'm not sure how [CC-1] wants to present it. I'm good with including ███ [.]" YOUNG replied, "Got it[.]" Five days later (on or about May 8th), CC-3 emailed CC-1 Company 3's draft RFI response, which stated that Company 3 and ███ were "pleased to submit" the RFI response to USAID.

On or about July 31, 2018, CC-1 texted YOUNG, "I[']m starting money talk with [CC-3] just to test the water[.]  Feels like it[']s gonna be same ole soup[.]"  YOUNG replied, "Do your thing my brother[.]"  CC-1 replied, "So I should cut ties with [CC-3]?  I mean it sounds like I[']m on my own[.]  That you have no part in any of this[.]"  YOUNG replied, "That is not what I was saying[.]"  CC-1 replied, "Do your thing my brother[] reads badly[.]"  YOUNG clarified, "You said you were starting talks. I meant go for it."  CC-1 replied, "Yep and hoping not to get the same ole soup[.]"  YOUNG replied, "You won[']t. He[']s expecting the talk."  CC-1 replied, "I[']m sure you appreciate the PRE work that goes into all of this [] and it[']s work[.]  Just to get people [in] the program office to see things my way[.]  Going to signal[.]"  Signal Messenger was an encrypted messaging platform that YOUNG, CC-1 and CC-3 regularly used to communicate in secret and in furtherance of the conspiracy.

On or about August 14, 2018, Company 3 was awarded its first USAID contract, which was a sole source contract.

### B.  CONTRACTS 6 AND 7

On or about August 15, 2018, CC-1 texted YOUNG, "[I]t[']s like I[']m out here on my own making deals so others can flourish no matter the amount I get monthly it[']s not the same as owning a business and flourishing for self ... it[']s like being on an island waiting for all the shit to hit the fan[.]" YOUNG replied, "I get what you are saying.  Why don[']t you make that leap.  I would help 100%.  We could team or however you want to do it."  CC-1 replied, "Not until this all comes full circle and where I am sure that I am thoroughly entrenched with future projects with AID and now the State Department... at least 2yrs[.]"

On or about September 10, 2018, CC-1 emailed CC-3 a contract award, formally referring to CC-3 as "Mr." and stating: "Please also provide times . . . for you and your firm to meet for a formal award kickoff meeting with me and the cognizant Contracting Officers Representative. Congratulations on your award and your future work with USAID."   In awarding this second contract to Company 3, CC-1 blind carbon copied YOUNG on this email.  CC-1 also blind carbon copied an email account for a shell company that CC-1 incorporated, which CC-1 used to submit fake invoices to YOUNG to receive and conceal bribe payments.

On or about September 28, 2018, Company 3 was awarded its third contract.

C.  **CONTRACT 8**

On or about July 8, 2019, CC-1 sent an email from his USAID email account to "undisclosed recipients" in which YOUNG and CC-3 were blind carbon copied.  CC-1 asked if YOUNG and CC-3 could perform a contract as opposed to a Native American small business.

On or about July 10, 2019, CC-3 texted YOUNG about meeting at a restaurant in Washington, D.C.  YOUNG replied, "Cool[.]"

The next day (on or about July 11th), CC-3 texted YOUNG and CC-1, "[G]uys, are we still on for 430?"  CC-1 replied, "I'm at home today so it's up to you all[.]"  YOUNG replied, "I will be there[.]"  CC-3 replied, "[S]ee y'all there."  A few hours later, CC-3 texted, "At the bar, got a table for three downstairs[.]"

On or about August 16, 2019, CC-1 awarded Company 3 its fourth USAID contract.

D.  **CONTRACT 9**

In and around January 2020, CC-2 and CC-3 developed a new arrangement in which they increased the payments to CC-1 that were funneled through YOUNG.

On or about January 7, 2020, YOUNG exchanged text messages with CC-2 and CC-3 about having Company 2's Accountant send payments to CC-1 through YOUNG:

- CC-2 texted YOUNG, "5 min to chat?"  YOUNG responded, "Yep."

- Shortly thereafter, CC-3 texted YOUNG, "Did [Company 2] pay you?"  YOUNG replied, "Hold on [I'm] on the phone with [CC-2]."

- Shortly thereafter, CC-2 texted YOUNG, "6500," and, "I thought it was 4000.  [Company 2 Accountant] told me that number.  Sheesh[.]"  YOUNG responded, "Got it," and then, "Done."  Then CC-2 stated, "I gave you the wrong number. It[']s worse," and "7500." YOUNG replied, "Ok will redo[.]"

On or about January 8, 2020, CC-2 and YOUNG continued to send text messages discussing the increased payments to CC-1:

- CC-2 texted YOUNG, "Hey, tell Your boy [CC-1] how we[']re handling this from now on. Figured [Company 2's Accountant] would tell [CC-1] to ask you." YOUNG asked, "Is [Company 2's Accountant] planning to execute payment for tomorrow?" CC-2 answered, "I[']ll ask [Company 2's Accountant] and let you know in a bit.  Just like you, our cash is tight too."

- During this exchange between YOUNG and CC-2, YOUNG also texted CC-1, and stated a few minutes earlier, "We can execute today if he [Company 2's Accountant] takes care of everything tomorrow[.]"

- Shortly thereafter, CC-2 texted YOUNG: "Text your friend [CC-1] and let him know we[']re setting up the new process[.] It[']s going to take til[l] tomorrow likely. I[']m guessing because [Company 2's Accountant] has been prepping for our new bank meeting and the support audit[.] This new way is a must because my financial situation has pulled everything out of my control[.]"  YOUNG replied, "I can take care today if I have something tomorrow[.]"  CC-2 replied, "Let me go confirm with [Company 2's Accountant]."

- Later that day, YOUNG texted CC-2, "Just checking to see if we are good for tomorrow. I did talk to him [CC-1]."  CC-2 replied, "We better be :)"

- Also that day, YOUNG texted Company 2's Accountant, "[J]ust checking that we are good for tomorrow." Company 2's Accountant replied, "For?"  YOUNG replied, "I was talking invoices."  Company 2's Accountant replied, "I was gonna do a wire tomorrow[.]  Do you want a check?"  YOUNG replied, "[W]ire is good but I needed to see in account tomorrow. I didn't want to disrupt my payroll tomorrow.  I won't but dealing with our guy was not going to be easy."

- On or about January 7, 2020, YOUNG paid CC-1 approximately $7,500.

On or about January 13, 2020, CC-1 emailed CC-3 and blind carbon copied YOUNG.  The email included a document entitled, "USAID endorsement letter to ▮▮▮▮▮▮."  This was an official USAID letter from CC-1 to CC-3 and Company 3, which stated Company 3 was "requesting to add [▮▮▮▮▮] to this contract as a sub-contractor."  The letter further stated: "It is my [CC-1's] understanding that [▮▮▮▮▮] brings a capability in agile solutions and IT managed services which will support [Company 3] in satisfying their contractual requirements on both the unclassified side and classified support side up to Top Secret level support."  Ultimately, CC-1 concluded that CC-2 and Company 2's "request to have ▮▮▮▮▮▮ as a subcontractor for the referenced award is **hereby approved**."

On or about June 1, 2020, CC-1 awarded Company 3 its fifth USAID contract.

### E.  CONTRACTS 10 AND 11

On or about June 3, 2020 (approximately two days after the award of the fifth contract to Company 3), and in the following months thereafter, YOUNG made the increased payments to CC-1.  YOUNG also did so in response to invoices from the above-discussed shell company that CC-1 incorporated to conceal bribe payments funneled by YOUNG.

| Approximate Date | Approximate Amount |
|---|---|
| 6/3/20 | $7,507 |
| 7/2/20 | $7,507 |
| 8/4/20 | $7,507 |
| 9/4/20 | $7,507 |
| 10/8/20 | $7,507 |

YOUNG, however, did not report these payments to the Internal Revenue Service. Moreover, YOUNG also claimed tax deductions for purported business expense payments that ███ made to CC-1 that were in fact bribe payments and, as such, should not have been claimed. Moreover, just as CC-1 incorporated a company to conceal bribe payments that YOUNG made, YOUNG thereafter incorporated a company to make payments in furtherance of the conspiracy.

### i. YOUNG Incorporates a Company That he Used to Funnel Approximately $34,500 in Four Separate Bribe Payments to CC-1.

On or about June 30, 2021, YOUNG invoiced Company 3 for "Impact International Services LLC JV Implementation Jun [sic] 2021" and charged $34,500.  Impact International Services was a company YOUNG recently incorporated.  Using this company, YOUNG concealed bribe payments to CC-1 that originated from CC-3 and Company 3.

On or about July 1, 2021, Company 3 transferred $34,500 to YOUNG and ██████' bank account.  In an additional effort to conceal this bribe payment to CC-1, YOUNG transferred the money to CC-1 in four separate payments, over three separate days, to two separate accounts (both of which were controlled by CC-1):

- on or about July 2, 2021, YOUNG transferred $7,500 to CC-1;

- on or about July 2, 2021, YOUNG transferred $9,000 to CC-1 for the purported purpose of "Payroll" even though YOUNG did not employ CC-1;

- on or about July 6, 2021, YOUNG transferred $8,000 to CC-1; and

- on or about July 7, 2021, YOUNG transferred $5,500 for the purported purpose of "Payroll" even though YOUNG did not employ CC-1.

### ii. YOUNG Continued Sending Money to CC-1 From CC-3.

In the months leading to the sixth and seventh USAID contracts that were awarded to Company 3—during which time Company 3 also competed for additional USAID contracts valued at approximately $100 million and $135 million—YOUNG funneled the following bribe payments to CC-1 on or about the same day that YOUNG received the payments from CC-3:

| Money Stream | Approximate Date | Approximate Amount Transferred From CC-3 to YOUNG | Approximate Amount YOUNG Transferred to CC-1 |
|---|---|---|---|
| 1) | 3/8/22 | $6,500 | |
| | 3/8/22 | | $6,500 |
| 2) | 4/5/22 | $8,500 | |
| | 4/5/22 | | $8,500 |
| 3) | 4/28/22 | $6,500 | |
| | 4/28/22 | | $6,500 |
| 4) | 6/3/22 | $6,500 | |

| | 6/3/22 | | $6,500 |
|---|---|---|---|
| 5) | 7/1/22 | $5,000 | |
| | 7/1/22 | | $5,000 |
| 6) | 7/6/22 | $5,000 | |
| | 7/6/22 | | $5,000 |
| 7) | 7/12/22 | $3,500 | |
| | 7/12/22 | | $3,500 |

On or about March 23, 2022, Company 3 was awarded its sixth USAID contract.

On or about May 9, 2022, Company 3 was awarded its seventh USAID contract.

### F.  CONTRACTS 12 AND 13

On or about August 11, 2022, CC-1 provided CC-3 with a technical evaluation package containing confidential information regarding the status of proposals Company 3's competitors submitted for the award of a contract with a total value of approximately $135 million.  The package contained confidential source selection information, including USAID's assessment of the strengths and weaknesses of bids, which indicated Company 3 was not the top candidate.

Between on or about October 21, 2022, and on or about October 24, 2022, as the evaluation of bids continued, CC-1 and CC-4 received approximately $60,000 in two separate transfers from YOUNG, which YOUNG received from CC-3, and which CC-1 ▮▮▮▮▮▮ used to make a downpayment on a residential mortgage.

On or about October 21, 2022, CC-4 texted YOUNG, "I need to send you the gift letter and what's needed to transfer the funds. What's a good email address?" YOUNG replied with his email address. Shortly thereafter, CC-4 forwarded YOUNG an email from the mortgage company that sent CC-4 a "gift letter" and, in that same email, CC-4 told YOUNG:

Form needs to be completed and you can send the money one of two ways:

1. Cashiers Check with receipt or transaction history

Must show a[s] being remitted from you on check and stub/receipt.  Should be made payable to ▮▮▮▮▮▮ [CC-1 ▮▮▮▮▮▮].

OR

2. Via wire transfer …

Shortly thereafter that same day, CC-4 texted YOUNG, "Just emailed you.  Let me know if you have questions.  If you can do this today that'd be great!" YOUNG replied "👍" to which CC-4 responded, "Forgot the amount… $60k[.]" YOUNG replied, "👍" to which CC-4 responded, "Sorry $66k[.]"

On or about October 24, 2022, YOUNG continued to text with CC-3 and CC-1 to coordinate the payment for the mortgage:

YOUNG texted CC-3, "So how do I do this. Go to my bank and get a cashier check against my business account for +60k for [          CC-1] and that will not send alerts? Also one person gifting that much."

Later that day, CC-1 texted YOUNG, "It[']s closing week. Let me know if I need to meet you or just come up or what[.]" YOUNG replied, "Send me your wire information …[.]" CC-1 replied, "60000 even and the other 2500 you can send tomorrow[.] The amount on the gift letter[.]"

Later in the day, CC-3 texted YOUNG, "Talk to          has the details on what exactly needs to be on the [check.]" YOUNG replied, "I talked with her."

Also on or about October 24, 2022,       submitted a "Gift Letter" for $60,000 to the lender that was financing the purchase of the residence that          CC-1 were purchasing. The letter indicates that YOUNG is the donor and a "Friend" of the recipients who are          CC-1. The letter also states, "The recipient and the donor also agree that the gift does not have to be repaid."

### G. CONTRACT 14

On or about August 8, 2023, CC-3 and Company 3 submitted a price quote of $36.9 million to work on a USAID contract. CC-3 submitted the quote via email to CC-1. Ultimately, CC-3 and Company 3 did not obtain this contract.

*       *       *

[SPACE INTENTIONALLY LEFT BLANK]

SO STIPULATED:

Glenn S. Leon
Chief
United States Department of Justice
Criminal Division, Fraud Section

_____
Matt Kahn
Brandon Burkart
Trial Attorneys
United States Department of Justice
Criminal Division, Fraud Section

Erek L. Barron
United States Attorney
United States Attorney's Office
District of Maryland

_____
Patrick D. Kibbe
Assistant United States Attorney
District of Maryland

_____
Paul Anthony Young
Defendant

_____
David Benowitz, Esq
Rammy Barbari, Esq.
PRICE BENOWITZ LLP
*Counsel for the Defendant*